Filed 10/9/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

THE PEOPLE,

　　　Plaintiff and Respondent,

v.

TRAVIS DEWAYNE HILL,

　　　Defendant and Appellant.

A168537

(Lake County
Super. Ct. No. CR961861)

　　　A jury convicted Travis Dewayne Hill of three counts of continuous sexual abuse of a child under the age of 14 (Pen. Code,[1] § 288.5, subd. (a)), three counts of sexual intercourse or sodomy with a child 10 years of age or younger (§ 288.7, subd. (a)), and three counts of oral copulation or sexual penetration with a child 10 years of age or younger (§ 288.7, subd. (b)).  Hill was sentenced to 75 years to life in prison.

　　　On appeal, Hill asserts section 288.5 violates the Sixth Amendment's jury unanimity requirement pursuant to *Ramos v. Louisiana* (2020) 590 U.S. 83 [140 S.Ct. 1390] (*Ramos*).  We disagree.  Section 288.5 requires jury unanimity as to the continuous-course-of-conduct element of the offense and permits jurors to disagree only as to the means by which that element is committed, which comports with the requirements of the Sixth Amendment.  Hill also raises a related challenge to the trial court's unanimity jury

---

[1] All undesignated statutory references are to the Penal Code.

1

instructions, which we deem forfeited as his substantial rights were not affected. Accordingly, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

*General Background*

Between 2015 and 2017, siblings D.M., S.M., and L.M. lived with their father across the street from Hill. D.M. was born in 2009, S.M. was born in 2008, and L.M. was born in 2006. Hill lived with his long-term girlfriend, Sarah G., and her two children, including L.G. (born in 2009); he referred to her children as his kids.[2]

In 2017, Yvonne Cox became the legal guardian for D.M., S.M., L.M., and their other siblings because their father was in poor health; they all moved in with her. Their mother had previously died, and their father died in 2018.

In 2021, D.M., S.M., and L.M. disclosed to Cox that they had been sexually abused by Hill when they lived across the street from him. Cox reported the abuse to police, ultimately leading to Hill's arrest.

In 2022, an amended information was filed charging Hill with nine counts relating to D.M., S.M., and L.M. As to each of those victims, it alleged that Hill had committed continuous sexual abuse on a child under the age of 14 (§ 288.5, subd. (a); counts 1, 4, and 7); sexual intercourse or sodomy with a child 10 years of age or younger (§ 288.7, subd. (a); counts 2, 5, and 8); and oral copulation or sexual penetration with a child 10 years of age or younger (§ 288.7, subd. (b); counts 3, 6, and 9). The information further alleged as to all counts that the victim was a child under the age of 14 and there were multiple such victims (§ 667.61, subds. (e) & (j)(2)), as well as numerous

---

[2] Meaning no disrespect, we refer to Sarah by her first name to avoid any reference to L.G.'s last name. (Cal. Rules of Court, rule 8.401(a)(3).)

circumstances in aggravation (Cal. Rules of Court, rule 4.421(a)(3), (4), (5), (6) & (11)).

A jury trial took place in March and April 2023. The following is a summary of the pertinent evidence presented.

*Prosecution Case*

*D.M.'s Testimony*

D.M. was 13 at the time of trial. When he lived across the street from Hill, D.M. played in the backyard of Hill's home with his kids every day after school.

D.M. described a pattern of sexual abuse by Hill that took place over the course of an entire school year when D.M. was seven years old. Hill would call D.M. into the house, saying he had something for him. Hill would pull D.M. into Hill's bedroom, remove D.M.'s clothes and some of his own clothes, and force D.M. to touch Hill's penis with D.M.'s hand or mouth or put his penis inside D.M.'s "butt." Hill made D.M. touch Hill's penis "[e]very day"; made D.M. put his mouth on Hill's penis more than 10 times and probably more than 20 times; and put his penis inside D.M. probably 10 or 11 times. Hill also sexually abused Sarah's daughter, L.G., in front of D.M., and forced D.M. to touch L.G.'s "butt and her private spot." When D.M. would leave Hill's house to go back outside, Hill called S.M. (D.M.'s sister) into the house in the same way; S.M. tried to get away from Hill but he pulled her inside. D.M. feared Hill because Hill had numerous guns around his house, including under the couch and hidden in cabinets, and Hill threatened D.M. The sexual abuse occurred only when Sarah was out of the house.

D.M. did not disclose the abuse when he lived with his father because Hill was an adult and D.M. trusted him. D.M. later told Cox about it and told her Hill's name. Cox found a photo corresponding to that name on Facebook

and confirmed with D.M. that it was the same man.  It was only once he spoke with Cox that D.M. realized what Hill did was wrong.  Cox did not tell D.M. at any point what to say about what happened to him; she only told him to tell the truth.

*S.M.'s Testimony*

S.M. was 14 at the time of trial.  She described a monthslong pattern of sexual abuse by Hill that took place when she was seven or eight years old.  The abuse occurred every day after school when S.M. went to play in Hill's front yard with Hill's kids; she did not recall playing with them in the backyard.  Hill would invite S.M. into the house, grab her, and pull her inside a bedroom.  Hill would pull down S.M.'s pants as well as his own, throw her on the bed, and get on top of her.  Hill put his "D-I-C-K" in S.M.'s mouth and privates.  She felt his privates go inside her privates while he moved up and down.  S.M. estimated Hill put his privates inside her mouth more than 20 times and inside her privates more than 10 times.  The first time Hill abused S.M., Hill showed her his guns and told her not to tell anyone or else he would shoot her.

Cox was the first person S.M. spoke with about the abuse.  Everything S.M. stated in court was "absolutely true."

*L.M.'s Testimony*

L.M. was 16 at the time of trial.  He testified that Hill sexually abused him when he was nine years old and lived across the street.  L.M. and his siblings played with Hill's children in their backyard after school.  The first time it happened, Hill called L.M. inside the house and pulled him into a bedroom, where Hill pulled both of their pants down and touched L.M.'s "wiener."  Hill also made L.M. touch and suck on Hill's wiener.  Hill told L.M. that Hill would hurt him if L.M. ever told.

The sexual abuse continued for "a couple years" and generally took place after school while Sarah was out of the house. Hill also put his wiener in L.M.'s "butt" during later occurrences. L.M. estimated Hill put his wiener in L.M.'s mouth around 15 to 20 times and put his wiener in L.M.'s butt more than 20 times. Sometimes, Hill made L.M. watch while Hill put his penis in L.G.'s "front area" or did these things to L.M. while L.G. watched. However, L.M. never saw L.G. doing anything sexual with any other children.

L.M. feared Hill because every time the abuse occurred, Hill told L.M. not to tell or else he would hurt L.M. L.M. saw guns hanging on the wall in Hill's room. Ultimately, L.M. disclosed the abuse to Cox after she asked if anything had happened to him. Cox did not tell L.M. what to say and everything in his testimony was the absolute truth.

*Cox's Testimony*

D.M. and S.M. told Cox in 2021 that they had been sexually abused by Hill. A couple of days later, L.M. also disclosed he had been abused by Hill. Cox had never heard of Hill before D.M. identified him to her. Cox found a picture of Hill on Facebook and confirmed with D.M. and S.M. separately that he was the person who abused them. Cox reported the abuse to police and brought all three children in for forensic interviews. Videos of the forensic interviews were played for the jury.

*Sergeant Cody White's Testimony*

In 2017, Sergeant Cody White investigated reports that Sarah and Hill each made against the other. Sarah reported criminal threats made by Hill and stated that Hill owned several firearms, which was one of the reasons she feared him. Hill reported that a revolver he had received from a family

5

member was stolen from his residence and stated he kept the gun in the dresser drawer of his bedroom.

*Sergeant Jeff Mora's Testimony*

Sergeant Jeff Mora was involved in the 2021 child sex abuse investigation. By the time of that investigation, Hill no longer lived at the home where the alleged assaults took place. Hill's new home was not searched, and Mora was not aware of any firearms being retrieved from Hill during the investigation. However, Mora monitored jail phone calls between Hill and Sarah discussing a firearm and those calls were played for the jury.

In one call, Hill said, "[F]or that gun situation, you go, I don't know what to say about that," to which Sarah replied, "Me neither." Hill then stated: "[W]hat you can tell 'em is it wasn't in the house. It was in the fucking room outside in the fucking playroom. It wasn't inside of our house. [¶] . . . [¶] It was in the playroom, and we didn't have no gun." Sarah replied: "I, I think I have a little bit of time, so, I mean, to come up with something." Hill indicated someone broke into their game room and stole numerous items, including "that piece of shit rusted thing."

In another call, Hill told Sarah "it's going to look bad on me if I go to the fuckin' trial right now about that fucked up gun" and that he "never had a gun in the house" but "[i]t could be in the game room." Sarah replied: "But that's catching us in a lie. That's catching you in a lie, because you already said there was no gun ever . . . ." Hill responded: "[T]ry to tell them is, I found this gun, and I . . . put it on a piece of board, and I took off and, and the next day . . . my game room . . . was broken into and . . . I only had it for maybe 2 days." When Sarah said she was not living with him at the time so she would not know if he had found a gun, Hill said, "Use your imagination." After Sarah said she will "have to figure something out," Hill said, "I just told

6

you what, what to say." Sarah reiterated she was not living with Hill at the time and would not know if he found a gun.

*Defense Case*

*Hill's Testimony*

Hill denied any sexual conduct with D.M., S.M., or L.M. Hill denied sexually abusing L.G. or forcing her to touch D.M., S.M., or L.M. Hill also denied ever owning a firearm, but then clarified that he once had a small, rusted gun that he had found while riding dirt bikes and put on a plaque in his game room out in the backyard.

Hill contested the basis of D.M., S.M., and L.M.'s testimony (i.e., that they were regularly playing in his yard with his kids and that is how he had access to them for the abuse). Hill did not recall any of them ever being at or playing at his house, and he would not have allowed them to do so as they were not a good influence on his own kids. It was not possible that D.M., S.M., or L.M was playing with L.G. in the backyard without his knowledge because the yard was fenced in, and he did not recall them being in the front yard. D.M., S.M., and L.M. never went into either Hill's bedroom or L.G.'s room. There were no doors inside the house, and it would therefore not be possible for someone to be concealed inside his bedroom.

Around 2007 or 2010, Hill began taking medications for mental health conditions that rendered him impotent. In the years when the alleged offense conduct took place, he was unable to achieve and sustain an erection and so no one could have seen him with an erection. Also during that time, Hill regularly took trips and vacations that ranged from one day to a week and a half. On cross-examination, Hill acknowledged he never told any doctor he was impotent.

On cross-examination, Hill first stated that he did not recall telling the police that Sarah stole a revolver inherited from his father from the dresser in his room. He then testified he made a false statement in that police report to try to get Sarah in trouble. Hill denied keeping a gun in his dresser and denied having inherited a gun.

Hill maintained that L.M. never went to Hill's house or backyard, even though L.M. had testified to seeing Hill's gun on a plaque on a wall, which was consistent with Hill's testimony. Hill also denied that he was coaching Sarah in the recorded jail phone calls about what to say regarding the gun; rather, he was just telling her the truth.

*Sarah's Testimony*

Sarah's direct examination was largely consistent with Hill's testimony. For example, she testified D.M., S.M., and L.M. did not come over to her house or play in her yard as Hill did not like for their kids to play with them. Sarah stated the home had no interior doors. Also, they stopped having sex after Hill started taking medication. Sarah did not suspect that Hill was abusing children.

On cross-examination, Sarah said she had lied to police when she reported that Hill had owned guns. She clarified Hill had a "parts gun" or pieces of a gun at one time that could not be fired. When asked whether she remembered a call with Hill when he was in jail where he was educating her on what to say about the gun, Sarah replied, "About the gun he found, not about anything else."

*L.G.'s Testimony*

L.G. was 14 at the time of trial. She played with D.M. and S.M. and sometimes with L.M. (she later said just once), but they were not allowed in each other's yards and they never went inside her house. The neighbor kids

8

would go straight home after school. L.G. denied any sexual conduct with D.M., S.M., L.M., or Hill. Hill never touched L.G. with her clothes off or made her touch him when his clothes were off.

*Verdict and Sentencing*

The jury returned a guilty verdict on all nine counts and found true the multiple-victim allegation. Hill waived jury trial on the circumstances in aggravation and the trial court subsequently found four of the circumstances true. (Cal. Rules of Court, rule 4.421(a)(3), (4), (5), & (11).)

On August 9, 2023, the court sentenced Hill to an aggregate term of 75 years to life in prison, comprised of three consecutive terms of 25 years to life for each count of continuous sexual assault of a child (§ 288.5, subd. (a)), with the sentences on the remaining counts stayed pursuant to section 654. Hill appealed.

## DISCUSSION

Hill challenges his convictions on two grounds. First, he asserts counts 1, 4, and 7 are void on the basis that section 288.5 is unconstitutional after *Ramos*, *supra*, 590 U.S. 83 held that the Sixth Amendment's jury unanimity requirement applies to the states under the Fourteenth Amendment. Second, he contends all counts must be reversed based on an alleged jury instruction error as to jury unanimity. We affirm.

## I. Section 288.5 Remains Constitutional After *Ramos*

Section 288.5, subdivision (a) defines continuous sexual abuse of a child as engaging in three or more acts of substantial sexual conduct or lewd conduct with a child under the age of 14 over a period of at least three months. To convict a defendant of the offense, a jury must unanimously agree that at least three such acts occurred with that child, but the jury need not unanimously agree "on which acts constitute the requisite number."

9

(§ 288.5, subd. (b).)  A defendant may be charged with only one count of continuous sexual abuse for each child victim.  (*Id.*, subd. (c).)

Hill avers section 288.5 violates the Sixth and Fourteenth Amendments in light of *Ramos* by permitting a jury to convict a defendant of continuous sexual abuse of a child without unanimously agreeing upon the underlying acts that support a finding of guilt.  Reviewing the statute's constitutionality de novo (*People v. Abbate* (2020) 58 Cal.App.5th 100, 109), we conclude section 288.5 does not violate the federal Constitution's jury unanimity requirement.

## A.  Applicable Legal Principles

A jury verdict in a criminal case must be unanimous and the jury must also unanimously agree that a defendant "is guilty of a *specific* crime." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132, citing Cal. Const., art. I, § 16.) Generally, when the trial evidence establishes multiple acts and any one of those acts could constitute a charged crime, the prosecution must select the particular act on which the charge was based, or the court must instruct the jury that it has to unanimously agree on the specific act underlying a guilty verdict.  (*People v. Jennings* (2010) 50 Cal.4th 616, 679.)  Several exceptions to this rule exist, including " 'when . . . the statute contemplates a continuous course of conduct or a series of acts over a period of time,' " as is the case with section 288.5.  (*Ibid.*; *People v. Cissna* (2010) 182 Cal.App.4th 1105, 1124 (*Cissna*).)

The Legislature expressly incorporated the continuous-course-of-conduct exception into section 288.5 to address the "vexing proof problems" in cases involving perpetrators "who reside with a minor or have unchecked access to a minor and are charged with repeatedly sexually molesting the minor over a prolonged period of time."  (*People v. Gear* (1993) 19 Cal.App.4th

10

86, 90 (*Gear*); see *id*. at pp. 90–92.) Often in such cases, "child victims are able to offer only 'generic testimony'; although they are able to describe 'repeated acts of molestation occurring over a substantial period of time,' they are 'unable to furnish many specific details, dates or distinguishing characteristics as to individual acts or assaults,' " which can make "proof of specific acts of molestation . . . murky, even where evidence of the cumulative conduct is clear." (*People v. Higgins* (1992) 9 Cal.App.4th 294, 299, 307 (*Higgins*); accord, *Gear*, at p. 90.) And so, our Legislature has defined the "operative element" of section 288.5 as a continuous course of at least three acts of abuse; the specific acts are but the means of committing the offense. (*Cissna, supra*, 182 Cal.App.4th at p. 1126.)

California courts have consistently held that section 288.5 does not violate a defendant's constitutional right to a unanimous jury verdict even though it does not require a jury to unanimously agree on *which* three acts support a finding of guilt. (*Cissna, supra*, 182 Cal.App.4th at pp. 1123–1126; *People v. Whitham* (1995) 38 Cal.App.4th 1282, 1296–1297; *Gear, supra*, 19 Cal.App.4th at pp. 92–94; *People v. Avina* (1993) 14 Cal.App.4th 1303, 1306 (*Avina*); *Higgins, supra*, 9 Cal.App.4th at pp. 301–302, 307.) The rationale is that section 288.5 requires jury unanimity as to the actus reus of the offense—which, as noted above, is the course of conduct itself—and thereby satisfies the constitutional jury unanimity requirement. (*Cissna*, at p. 1124 ["There is no violation of the constitutional right to unanimous agreement on the criminal conduct because the actus reus of the offense is the course of conduct, not a specific act."]; accord, *Whitham*, at p. 1296; *Gear*, at pp. 92–93; *Avina*, at p. 1313; *Higgins*, at p. 304.)

The line of cases finding section 288.5 constitutional has continued even after *Richardson v. United States* (1999) 526 U.S. 813 [119 S.Ct. 1707]

11

(*Richardson*) concluded a federal continuing criminal enterprise statute (former 21 U.S.C. § 848) required jury unanimity as to which specific violations made up the " 'continuing series of violations' " required for a conviction under that statute.[3] (*Richardson*, at p. 815; *Cissna, supra*, 182 Cal.App.4th at pp. 1125–1126.) *Cissna* noted that *Richardson* cited *Gear, supra*, 19 Cal.App.4th at pages 90–92 to distinguish state child sexual abuse statutes—among them section 288.5—that allow for jury disagreement as to the specific underlying incidents and instead require proof of only a continuous course of conduct because such statutes " 'may well respond to special difficulties of proving [individual] underlying criminal acts.' " (*Cissna*, at p. 1126, citing & quoting *Richardson*, at p. 821.) Given those "difficult problems of proof," which were absent in *Richardson, Cissna* concluded that "*Richardson* supports the constitutionality of the continuous-course-of-conduct exception applied by the Legislature in section 288.5, subdivision (b)." (*Cissna*, at p. 1126.)

Hill contends *Ramos* effectively abrogated this case law. For the reasons we discuss, we disagree.

## B. *Ramos* Does Not Render Section 288.5 Unconstitutional

Hill's argument that *Ramos* renders section 288.5 unconstitutional ultimately rests on a single line in *Richardson*. Specifically, when distinguishing the statute at issue in *Richardson* (former 21 U.S.C. § 848) from state continuous-course-of-conduct statutes such as section 288.5, the United States Supreme Court noted: "The cases are not federal but state,

---

[3] That statute defined " 'engag[ing] in a continuing criminal enterprise' " in relevant part as a violation of certain federal drug laws where " 'such violation is a part of a continuing series of violations' " of those laws. (*Richardson, supra*, 526 U.S. at p. 815, quoting former 21 U.S.C. § 848(c).)

12

where this Court has not held that the Constitution imposes a jury-unanimity requirement." (*Richardson*, *supra*, 526 U.S. at p. 821.)

Subsequently, in *Ramos*, the Court did just that, expressly holding the Sixth Amendment's jury unanimity requirement "applies to state and federal criminal trials equally." (*Ramos*, *supra*, 590 U.S. at p. 93.) *Ramos* addressed whether Louisiana's and Oregon's rules permitting convictions of serious offenses based on 10-to-2 jury verdicts violated the Sixth Amendment (as incorporated against the states by the Fourteenth Amendment). (*Id.* at pp. 87–88.) The Court answered that question in the affirmative, concluding the Sixth Amendment required jury unanimity in both federal and state courts. (*Id.* at p. 93.) Notably, *Ramos* did not concern or otherwise address crimes based on a continuous course of conduct.

According to Hill, *Ramos*'s holding that the Sixth Amendment jury unanimity requirement applies to the states renders *Richardson* no longer distinguishable and compels the conclusion that section 288.5 violates that federal constitutional right. We are aware of no published California decisions addressing this contention.

First, and most importantly, none of the cases cited above holding that section 288.5 does not violate the constitutional right to jury unanimity based their conclusion on anything distinct or special about the *state* right to a unanimous jury verdict, as opposed to the analogous right in the Sixth Amendment. Rather, all those holdings were rooted in the fact that section 288.5 *does* require jury unanimity as to the actus reus element of the offense (the course of conduct), and for that reason passes constitutional muster. (*Cissna*, *supra*, 182 Cal.App.4th at p. 1124; *People v. Whitham*, *supra*, 38 Cal.App.4th at p. 1296; *Gear*, *supra*, 19 Cal.App.4th at pp. 92–93; *Avina*, *supra*, 14 Cal.App.4th at p. 1313; *Higgins*, *supra*, 9 Cal.App.4th at p. 304.)

13

This remains equally true under the Sixth Amendment right to jury unanimity as applied to the states in *Ramos*. (See, e.g., *Richardson, supra,* 526 U.S. at p. 817 [Sixth Amendment does not require jury unanimity on which of several possible means defendant used to commit an element of a crime]; *State v. Tran* (2024) 154 Hawai'i 211, 219 ["The growing body of post-*Ramos* state and federal case law confirms that *Ramos* did not disturb the well-established doctrine that the Sixth Amendment to the U.S. Constitution does not require jury unanimity as to specific underlying facts or 'means' to convict a defendant of a continuing course of conduct offense . . . ."]; see also *Cissna, supra,* 182 Cal.App.4th at p. 1126 [specific acts are the means of committing section 288.5 offense].)

We note that in *Avina,* a pre-*Ramos* decision finding section 288.5 constitutional, our colleagues observed the Supreme Court had cautioned the *federal* Constitution "may impose some limit on the generality with which offenses are defined" when addressing "a related question of jury uniformity" in *Schad v. Arizona* (1991) 501 U.S. 624 [111 S.Ct. 2491] (*Schad*), abrogated on another ground in *Ramos, supra,* 590 U.S. 83. (*Avina, supra,* 14 Cal.App.4th at pp. 1312, 1311.) Noting that limit was based on " 'a distillate of the concept of due process with its demands for fundamental fairness, . . . and . . . rationality,' " *Avina* concluded section 288.5's definition of continuous child sexual abuse as a course-of-conduct crime was a fair and rational answer to the potential for unfairness that " 'generic' " testimony represents for both the prosecution and the defendant in such cases. (*Avina,* at p. 1312, quoting *Schad,* at p. 637 (plur. opn. of Souter, J.).)

In particular, generic testimony may expose a defendant to a multitude of convictions for noncontinuous child sex abuse (§ 288), "limited only by the discretion of the prosecutor"; but if differentiating testimony were required

14

for each count of child abuse, it would shield from prosecution many egregious child abusers who repeatedly victimize the youngest children. (*Avina, supra*, 14 Cal.App.4th at p. 1312.) *Avina* reasoned: "Section 288.5 achieves a rational, fair reconciliation of these conflicting considerations. The statute is written so as to apply only to the particular class of offenders that has given rise to these problems, abusers with residential or recurring access to the child. It allows prosecutors to seek significant penalties against the resident molester, without demanding unrealistic precision from the child witness. At the same time, it limits the offender's potential liability to a single count against a given victim, thus eliminating the potential for arbitrary variation in charging and punishment present under section 288." (*Ibid.*)

As a result, *Avina* concluded section 288.5—which permits a conviction based on jury unanimity as to the actus reus course of conduct even if there is juror disagreement as to particular acts—does not violate a defendant's constitutional right to due process or jury unanimity. (*Avina, supra*, 14 Cal.App.4th at pp. 1312–1313.) Hill points to no convincing reason why *Avina*'s reasoning or holding is cast into doubt by *Ramos*'s application of the Sixth Amendment to the states, and we can discern no such reason.

We recognize that *Richardson* stated "the Constitution itself limits a State's power to define crimes in ways that would permit juries to convict while disagreeing about means, at least where that definition risks serious unfairness and lacks support in history or tradition." (*Richardson, supra*, 526 U.S. at p. 820, citing *Schad, supra*, 501 U.S. at pp. 632–633.) However, *Avina* expressly recognized that *Schad* observed a federal constitutional limit to a state's power to define crimes in the way that section 288.5 does, yet found section 288.5 does not run afoul of that limit because it does *not* risk

15

unfairness. (*Avina, supra*, 14 Cal.App.4th at pp. 1311–1313.) Rather, section 288.5 provides various safeguards to defendants while also permitting limited prosecution of egregious child abusers who either reside with or, like Hill, have recurring access to the minors, even where evidence of such abuse arises through "generic" victim testimony. (*Avina,* at p. 1312.)

Indeed, *Richardson* observed the state practice of permitting jurors to disagree about the specific underlying acts (as long as they agree upon the continuous course of conduct) "may well respond to special difficulties of proving individual underlying criminal acts" in child sex abuse cases, a factor that was notably absent in that case. (*Richardson, supra*, 526 U.S. at p. 821, citing *Gear, supra,* 19 Cal.App.4th at pp. 90–92.) As explained in *Gear*, young child abuse victims " 'may have no practical way of recollecting, reconstructing, distinguishing or identifying by "specific incidents or dates" all or even any such incidents' " (*Gear,* at p. 90); this is precisely why courts have found generic testimony both useful and constitutionally permissible in child sex abuse cases under the continuous-course-of-conduct exception applied in section 288.5 both before and after *Richardson*. (See *Cissna, supra*, 182 Cal.App.4th at p. 1126 [*Richardson* supports constitutionality of section 288.5's continuous-course-of-conduct exception]; *Avina, supra*, 14 Cal.App.4th at pp. 1312–1313.)

We are not persuaded by Hill's assertion that, after *Ramos*, the constitutional concern noted in *Richardson* necessarily applies to these state statutes. That the Sixth Amendment's jury unanimity requirement had not been applied to the states was only one basis on which *Richardson* distinguished continuous child sex abuse statutes, and it did not play any part in *Cissna*'s holding that *Richardson* did not affect the constitutionality of section 288.5. (See *Richardson, supra*, 526 U.S. at pp. 821–822; *Cissna,*

16

*supra*, 182 Cal.App.4th at pp. 1125–1126.)  Rather, as previously discussed, the critical distinction was the difficulty of proving individual acts in cases of child sexual abuse based on generic testimony (see *Richardson*, at p. 821; *Cissna*, at p. 1126), which was the exact reason section 288.5 was enacted (*Gear*, *supra*, 19 Cal.App.4th at pp. 90–92; *Higgins*, *supra*, 9 Cal.App.4th at p. 307).[4]  Further, *Richardson* distinguished child continuous sex abuse statutes on the basis that their "special subject matter indicates that they represent an exception" rather than "a rule." (*Richardson*, at p. 821.)  *Ramos* does not change that.

Finally, we note that courts in other states with similar continuous sexual abuse statutes that have considered this issue have concluded that *Ramos* does not undermine the constitutionality of those statutes.  (E.g., *State v. Tran*, *supra*, 154 Hawai'i at pp. 218–221; *Carbajal v. State* (Tex. App. 2022) 659 S.W.3d 164, 182 [*Ramos* has no impact on case law holding continuous sexual abuse statute requires a unanimous verdict].)

In sum, we hold that Hill has not shown that section 288.5 is unconstitutional after *Ramos*.  Accordingly, Hill's constitutional challenge to his convictions on counts 1, 4, and 7 is without merit.

## II.  Jury Instruction Claim Is Forfeited

Hill next contends the trial court erred by giving allegedly conflicting jury instructions as to the requirement of jury unanimity, warranting reversal of all of his convictions.  Hill apparently admits that he did not

---

[4] *Richardson* concerned a matter of statutory interpretation and, as such, addressed constitutional principles only to guide that statutory interpretation.  (See *Cissna*, *supra*, 182 Cal.App.4th at p. 1125; see also *Richardson*, *supra*, 526 U.S. at p. 818 ["When interpreting a statute, we look first to the language."].)

propose different or additional instructions as to unanimity in the trial court but contends the claim is not forfeited as the alleged error affected his substantial rights. (§ 1259.) We are not convinced.

"'Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was.'" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.) Therefore, we address the merits of the claim only to determine if Hill's substantial rights were affected.

Generally, "[w]e review a claim of instructional error de novo. [Citation.] The challenged instruction is considered 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.'" (*People v. Rivera* (2019) 7 Cal.5th 306, 326.) "'Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions.'" (*People v. Thomas* (2023) 14 Cal.5th 327, 382.)

The trial court provided two jury instructions related to unanimity.

The first, CALCRIM No. 1120, related specifically to the instruction given as to "Continuous Sexual Abuse (Pen. Code, § 288.5(a))." For those charges only, as relevant here, the court instructed: "You cannot convict the defendant unless all of you agree that he committed three or more acts over a period of at least three months, but you do not all need to agree on which three acts were committed."

The second, CALCRIM No. 3501, concerned unanimity as to all charged offenses: "The People have presented evidence of more than one act to prove that the defendant committed each of these offenses. You must not find the

18

defendant guilty of any offense unless: [¶] 1.  You all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed for each offense; [¶] OR [¶] 2.  You all agree that the People have proved that the defendant committed all the acts alleged to have occurred during this time period and have proved that the defendant committed at least the number of offenses charged.  Counts one, four and seven require proof of three or more acts per count."

Hill states that CALCRIM No. 3501 "is an accurate statement of the law" but avers CALCRIM No. 1120 "directly contradicts it" by not requiring unanimity of acts as to counts 1, 4, and 7, which he asserts is incorrect.  He premises this claim on substantially the same arguments we rejected in section I, *ante*, that section 288.5 requires jury unanimity as to each act that supported a finding of guilt for counts 1, 4, and 7.

For the reasons already discussed, that claim is unavailing.  Hence, the instructions did not conflict.  Rather, CALCRIM No. 1120 accurately and plainly instructed the jury that—*only* as to the section 288.5 counts—it had to unanimously agree he committed at least three acts during the requisite period of time but need not agree on which three acts were committed.  And, as Hill concedes, CALCRIM No. 3501 accurately instructed the jury as to unanimity as to all counts.  Although Hill suggests the jury may have chosen to follow CALCRIM No. 1120 as to all nine charges and not just counts 1, 4, and 7, there is no support for such a finding, and, as noted, we presume the jury was able to understand and correlate instructions and that it followed the given instructions.  (*People v. Thomas*, *supra*, 14 Cal.5th at p. 382.)

We conclude the jury instruction claim is without merit and, therefore, Hill's substantial rights were not affected.  As a result, the claim is forfeited.

**DISPOSITION**

The judgment is affirmed.

                              PETROU, J.


WE CONCUR:


TUCHER, P. J.

FUJISAKI, J.


A168537 / *People v. Hill*

Trial Court:          Lake County Superior Court

Trial Judge:          Hon. Andrew S. Blum

Counsel:

Dale Dombkowski, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Donna M. Provenzano, Supervising Deputy Attorney General, Victoria Ratnikova, Deputy Attorney General, for Plaintiff and Respondent.